OPINION
The state appeals from a judgment of the Montgomery County Court of Common Pleas which granted Keith Cavins' motion to suppress.
Deputy Bryan P. Statzer of the Montgomery County Sheriff's office was the sole witness at the suppression hearing. His testimony presented the following version of events.
Around 7:00 a.m. on December 26, 1998, Deputy Statzer was on routine patrol on I-675 in Washington Township. After seeing a vehicle traveling at a high rate of speed and tracking the vehicle at eighty-one mph on his doppler radar, Deputy Statzer initiated a traffic stop. The vehicle had Kentucky license plates and was occupied by a driver, Robert Sallie, and a passenger, Keith Cavins. Sallie was unable to produce a driver's license so Deputy Statzer asked him to sit in the patrol car while he processed his information.
While Sallie was in the back of the patrol car, Deputy Statzer asked him a number of questions, including where he was from and where he was going. When Sallie indicated that he was going to visit his ill grandfather, Deputy Statzer asked further questions regarding how ill the grandfather was, whether the grandfather was in the hospital, how long Sallie planned to stay, and whether Sallie had packed any luggage. When Sallie indicated that he had planned to stay "a day or two[,]" but that he had not packed any luggage, Deputy Statzer found the information "very unusual" and decided to question Cavins too. At this time, Sallie's information was still being processed through the computer.
Deputy Statzer approached Cavins and began asking him the same line of questions that he had asked Sallie. Cavins' answers to the questions matched Sallie's answers. When Deputy Statzer asked Cavins for "some type of id[,]" Cavins produced proper identification and informed Deputy Statzer that he was the owner of the vehicle. Deputy Statzer then asked Cavins whether any weapons or drugs were in the vehicle. Cavins answered "no" and then he reached into the back seat to sweep a jacket across the seat "in essence, kind of * * * showing that no, there's nothing back there." As he moved the jacket, Deputy Statzer noticed a box of shotgun shells on the seat underneath where the jacket had been located before Cavins had moved it. Upon seeing the shells, Deputy Statzer asked Cavins again whether he was sure that there were no weapons in the car. Cavins then stated, "I don't think so."
Deputy Statzer asked Cavins if he could search the car. Cavins gave him verbal permission to search. Deputy Statzer took Cavins to the patrol car where he patted him down, placed him in the car, and read the "consent to search" form to him. Cavins signed the form. As Deputy Statzer began to exit the patrol car, Cavins told him that "there might be a possibility [that] there was a Smith Wesson semi-automatic handgun was underneath the driver's seat of the car."
Deputy Statzer went to Cavins' vehicle, looked under the driver's seat, and found a Smith Wesson semi-automatic handgun in a holster, with the handle of the gun pointing toward the front of the car. An evidence technician later determined that "the gun had a live round that was chambered, hollow point ammunition, as well as [a] magazine [that] was loaded with hollow point ammunition." Deputy Statzer arrested Cavins and charged him with carrying a concealed weapon.
On July 26, 1999, Cavins filed a motion to suppress the seized handgun, arguing that Deputy Statzer had "lacked probable cause to stop and detain" him. After a suppression hearing on August 25, 1999, the trial court granted Cavins' motion to suppress on September 10, 1999.
The state advances two assignments of error on appeal.
 I. THE TRIAL COURT ERRED IN FINDING THAT APPELLEE WAS UNLAWFULLY DETAINED BY POLICE.
The state makes two arguments under this assignment of error. First, it argues that Deputy Statzer's detention of Cavins was lawful. Second, it argues that Cavins' consent to the search of his vehicle was voluntarily given.
In granting the motion to suppress, the trial court stated the following:
 Once the stop was made, Officer Statzer properly detained [Cavins] and the driver in order to obtain information to prepare the violation for speeding. The driver was placed in the cruiser initially in order to gather his information to check to see if he had driving privileges since he was without a license. [Cavins] was properly detained for the issuance of a speeding violation. However, the detainment for a speeding violation consequently led to a detainment for a search which led to the discovery of a Smith Wesson handgun.
 This Court has difficulty with how weapons became an issue in this matter. Officer Statzer testified that he began questioning the driver of the vehicle when he was in the back seat of the cruiser. The driver was asked such questions as where he was going to and coming from, how long he was planning on staying, did he have any luggage, and about his grandfather's illness. Officer Statzer then immediately proceeded back to the stopped vehicle and asked [Cavins] the same questions.
 Once, [sic] [Cavins] confirmed the story and there were no conflicts, Officer Statzer asked [Cavins] if there were any weapons in the car. It is at this point that the Court is at odds [with] why Officer Statzer proceeded with such questioning. There does not appear to be any reasonable explanation other than he thought it was odd for people to be going somewhere over night and not have any luggage.
 Nothing indicates that Officer Statzer had probable cause to begin questioning [Cavins] in such a manner. Additionally, Officer Statzer questioned [Cavins] without providing him with Miranda warnings. Officer Statzer testified that he had no reason to believe that [Cavins] and the driver were armed and dangerous. Accordingly, [Cavins] was improperly detained without Officer Statzer having probable cause or even a reasonable suspicion that there may have been weapons in the vehicle.
"When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses." State v. Clary (Sept. 30, 1996), Lawrence App. No. 96CA7, unreported, at *2, citing State v. Mills (1992),62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982, certiorari denied (1992), 505 U.S. 1227, 112 S.Ct. 3048. Thus, "in its review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." Clary, at *2, citing State v. Guysinger (1993), 86 Ohio App.3d 592, 594,621 N.E.2d 726, 727. The appellate court must, however, determine denovo whether the trial court's conclusions of law, based on those findings of fact, are correct. Guysinger, 86 Ohio App.3d at 594,621 N.E.2d at 727.
It is undisputed that the initial traffic stop of the vehicle for speeding was valid. The state argues that the trial court erred when it concluded that Cavins had been improperly detained because it is permissible to detain and question a motorist as long as the questioning does not unnecessarily prolong the detention.
In State v. Lenoir (June 6, 1997), Montgomery App. No. 16246, unreported, two police officers initiated a traffic stop of Lenoir's vehicle after observing him make a turn without properly signaling. Lenoir, at *1. The officers approached the vehicle, asked Lenoir for identification, and then asked Lenoir if he had any weapons in the car. Id. Lenoir admitted that he had had a "work knife" and, after he had produced the knife, the officers asked him to step out of the car. Id. As he stepped out, an officer spotted crack cocaine on the driver's seat and Lenoir was arrested for drug abuse. Id. at *1-*2. In his motion to suppress, he argued that the duration of the stop exceeded the extent necessary to effectuate the purpose of the stop. Id. at *2. We held that the trial court did not err in overruling his motion to suppress because:
 [T]he purpose for the stop had not been concluded when the inquiry was made. Although a citation for making an unlawful left turn was ultimately issued, it had not been issued at the time that [the officer] inquired whether Lenoir had any weapons. Therefore, the duration of the detention was not extended for the purpose of conducting further investigation, and we fail to see that the scope of the stop and detention was extended in any intrusive way when [the officer] asked Lenoir if he had any weapons.
Id. at *3.
Deputy Statzer's testimony revealed that he had been awaiting the results of the computer search on Sallie's information at the time he had approached Cavins to question him. He further stated that he did not believe that he had received the computer results at the time he had searched the car. Thus, the duration of Cavins' detention was not extended by Deputy Statzer's questioning of him. There would have been a delay, regardless of the questions, while they awaited the computer results.
Further, in Lenoir, we stated:
 Police officers making a traffic stop have a legitimate reason to be concerned about the possibility that the person being stopped may be armed, because "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." Michigan v. Long (1983), 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201[, 1220].
 To be sure, even a search for weapons must be based upon observations or facts known to the police officer creating a reasonable suspicion that a weapon may be present. But a simple inquiry as to whether the person stopped has a weapon is not a search or seizure. Indeed, it would appear to be a prudent, flexible response by a police officer when his "sixth sense" tells him that a weapon may be at hand, but he may not be able to articulate a reasonable factual basis for that suspicion. We would be loathe to hold that in such a case the police officer cannot even inquire about the presence of weapons.
Thus, Deputy Statzer was permitted to ask Cavins about the presence of weapons in the car, especially when his intuition told him that there had been something "very unusual" about the situation.
Cavins cites a number of cases in an attempt to support the trial court's conclusion that his detention was improper. The cases which he cites, however, are distinguishable. In those cases, the questions which led to the discovery of incriminating evidence occurred either after the officers had issued citations to the drivers or after they had determined that their earlier reasonable suspicions for the traffic stops had been incorrect. Here, Deputy Statzer was awaiting the computer results when he questioned Cavins, so his reason for the initial traffic stop had not been concluded.
Finding this part of the state's argument to be persuasive, we need not address the state's argument that Cavins' consent to search was voluntarily given.
The first assignment of error is sustained.
 II. THE TRIAL COURT ERRED IN HOLDING THAT MIRANDA WARNINGS ARE REQUIRED BEFORE POLICE MAY QUESTION AN INDIVIDUAL DURING A TRAFFIC STOP.
The state argues that the trial court "erred when it found that Deputy Statzer was required to read [Cavins] his Miranda
rights before asking him if weapons were present in his vehicle."
In granting the motion to suppress, the trial court stated, "Additionally, Officer Statzer questioned [Cavins] without providing him with Miranda warnings." Cavins argues that "just because the court noted that there were no Miranda warnings, that is not the same as saying that the officer was required to give them."
Although it is unclear whether the trial court made this statement as a mere observation or as an indication that the court believed that Miranda warnings should have been given to Cavins before he was questioned, Miranda warnings were certainly not necessary in this case.
A suspect must be advised of certain rights before his statements made during a custodial interrogation will be admissible. Miranda v. Arizona (1966), 384 U.S. 436, 444,86 S.Ct. 1602, 1612. The Miranda Court defined "custody" as being "taken into custody or otherwise deprived of * * * freedom of action in any significant way. Id. "It is well established that roadside questioning of a motorist pursuant to a routine traffic stop does not ordinarily constitute custodial interrogation requiring Miranda warnings." State v. Funderburg (Dec. 4, 1998), Clark App. No. 98 CA 6, unreported, at *3, citing Berkemer v.McCarty (1984), 468 U.S. 420, 440, 104 S.Ct. 3138, 3150. "In the absence of coercive conditions, * * * the short detention involved in a traffic stop falls outside the scope of [Miranda] * * *."State v. Campbell (Aug. 9, 1995), Clark App. No. 94-CA-78, unreported, at *4. Nothing in the record indicates that Cavins was questioned under coercive conditions, so Deputy Statzer was not required to give Miranda warnings before questioning him.
The second assignment of error is sustained.
The judgment of the trial court will be reversed, and this matter will be remanded for further proceedings.
GRADY, P.J., and FAIN, J., concur.